*Story summarized from American Banker*

## "We'll settle or sue"— 25 Attorneys General put the heat on Ameriquest

**June 30, 2005**

Ameriquest Capital Corp. is the nation's top subprime mortgage lender. In the three years from 2001 to 2004, the company's mortgage business grew more than twelve fold to $82.7 billion. This was much higher than the most positive estimate for the subprime industry's growth in that period.

Ameriquest's headquarters is a 12-story high-rise in southern California that blends in with many others that provide the scenery along Orange County's freeways. The company has one shareholder—Roland Arnall, a Los Angeles billionaire—rumored to be on a short list for the U.S. ambassadorship to the Netherlands.

When the company's marketing strategy changed a couple of years back to include TV ads, millions of new customers responded. Despite the newly spawned name-recognition, little was known about the company itself and how it operates.

Until recently Arnall's nephew, Adam J. Bass, was the only executive to give interviews. Ameriquest's senior executive vice president, Bass talked mostly about his company's agreement in 2000 with the Association of Community Organizations for Reform Now, the consumer advocacy group whose actions were instrumental in Ameriquest's adoption of a set of "best practices."

Recently, Ameriquest has been getting attention it wants even less. In March 2005, *American Banker* published a story about 25 state attorneys general who are investigating Ameriquest's retail lending operations. Since then, several more attorneys general have signed on. Ameriquest prefers settlements to lawsuits, and recent interviews by American Banker discovered that a settlement amount in the current investigation might exceed the $484 million Household International Inc. paid in 2002 —in response to allegations of predatory lending by all 50 states.

To counter the new allegations, several of the company's executives agreed to grant American Banker interviews on regulatory issues, business strategy, and the possibility of the company going public.

**Regulatory Issues**

Last February, two days before the 2005 Super Bowl—during which Ameriquest advertised extensively—the Los Angeles Times ran a story about employees in Ameriquest's branches and call centers who had falsified the incomes of borrowers and had also used bait-and-switch tactics with potential customers.

Ameriquest had revealed the investigation by the state attorneys general in a bond filing a year ago, but the disclosure went virtually noticed until it was reported by *American Banker*.

The Attorney General for the state of Iowa, Tom Miller, heads the subprime lending task force of the attorneys general across the nation, and is also leading the investigation of Ameriquest. This week his view was that his group would either settle "soon" or sue.

Miller said he didn't "want to make any reference to where we might be on a number," but the Attorney General for Connecticut, Richard Blumenthal, thought the Household settlement of $484 million—along with major changes in lending practices—"could be a model" for a settlement with Ameriquest.

The article in the Los Angeles Times along with news of the investigation by the attorney's general prompted the Greenlining Institute, an active consumer organization, to send back a $100,000 donation from Ameriquest.

**More regulatory problems**

In Connecticut a few years ago the state's banking department discovered that Ameriquest had conducted repeated solicitations of their customers for refinancing after too short an interval. In their settlement on Jan. 22, 2004, the company agreed to pay $603,552 in refunds, plus $500 to each borrower (totaling $62,000), and a civil penalty of $5,000 to the state. Connecticut Banking Commissioner John Burke oversaw the settlement.

But similar problems arose again, motivating a threat from the Connecticut Department of Banking to retract Ameriquest's license. The case is still pending.

Georgia and Delaware, and some other state agencies, said they have not had many complaints from consumers about Ameriquest, but Chuck Cross, a director at Washington's Department of Financial Institutions, said the allegations made by the Los Angeles Times, and the problems under investigation by the attorneys general, were similar to those he and other financial regulators have observed nationwide.

Cross said that although his office has not issued an official report on Ameriquest, the findings in its last examination have been given to the department's enforcement division.

Cross's office had gotten 87 complaints against Ameriquest up to March 24, 2005. Some went back to 1997, but most of them were more recent. Only 69 complaints were received against Household prior to the settlement. Cross did not say whether Washington was also a part of the multi-state investigation by the attorneys general.

Ameriquest also has a four-state class action suit in progress for approximately $50 million in California, and a case pending in Florida concerning loans from Florida and Illinois.

Aseem Mital recently became the CEO of ACC Capital Holdings, the umbrella company for Ameriquest Mortgage Co., and Argent Mortgage, the company's wholesale unit. Mital is frustrated by the lumps his company is taking.

"There were instances [of abuse], and we dealt with those right away," he said. "[If somebody] bends the rules, we get rid of those people and immediately go back and … [find out] if there was any customer [who had been treated unfairly]. We're not about … having an aggressive sales culture."

Mital admitted that Ameriquest's lending practices might not be above criticism. "We can't design the perfect system in a human-oriented process."

Ameriquest's general counsel, Tom Noto, said the company would rather settle cases when it finds problems it might have caused, and sometimes it identifies problems before anyone else.

"We prefer informal resolutions," Noto said. "Basically, if you see a problem, what's the point of going to the mat in court? You try to reach a reasonable resolution."

He says his company's philosophy is "to look at the merits of the case and, if things didn't go according to our procedure, step up to the plate and address it. You try to run a zero-defect business. Not everybody can do that, and when you don't, you step up."

Ameriquest began making interest-only loans in March 2005 after "looking very hard at the product," said Renne Deane, executive vice president at Ameriquest'. Loans are made with interest-only periods of only five-year, with a required minimum FICO score of 620 or 700, based on the loan. Interest only loans are limited to 20% of total production.

Two of the areas the attorneys general are investigating involve "stated-income loans" and appraisals.

Regarding the former, applicants fill in their incomes on a 1003 form, then "write a letter in their own handwriting stating that they make X amount of dollars per month or per year, and whatever specific job that is."

A "reasonability test" is then applied to see if the income stated fits the job and the area where the applicant resides, Deane said.

In 2004, according to figures provided by Ameriquest, stated-income loans dropped to 11% of retail production, from 19% in 2003, the company's peak year for this type of product. Limited-documentation loans increased 4 %, to 13% of retail originations; "full-doc" loans also increased by 4% to 76%.

The trend at Argent has been in the other direction. Stated-income loans doubled since 2001 to more than one third of wholesale production in 2004.

In regard to appraisals, Deane said her company makes use of a "preferred panel" of licensed appraisers each of whom has a minimum of five years' experience. Appraisals are submitted electronically in a format that does not allow any manipulation of data. The appraisals are "run through a series of rules" to make sure comparable sales are used. In-house appraisers look over about 30% of the appraisals prior to granting the loans.

Salespeople have "no influence" on who is on the appraisal panel, Deane said.

After funding, a quality assurance team audits "up to 10% of Ameriquest production", she said. Less than 5% of the loans are excluded from pools because of appraisal problems.

Mital said, "Growth [at Ameriquest] is not just about volume, but growing in customer satisfaction, how we serve communities, and keep our employees engaged and happy."

A spokesman said that Ameriquest is looking at its compensation structure for originators to make sure it provides "incentives that support our best practices."

According to Mital, the company will not only expand its "best practices" guidelines and try to further automate the mortgage process, but it also will focus more on customer service and keeping its employees happy.

Ameriquest is also changing the types of loans it offers in the direction of being more consumer friendly. The company began making prime loans in December in a pilot test with Freddie Mac; Argent will follow eventually.

It's expected that one result will be to increase the percentage of applications that get funded, Deane said.

"…we're taking many more applications than we're actually pulling through," she said. The company's pull-through rate is only 10%. "…we don't have products to offer them,

so our goal is to be able to offer all products to all borrowers,"

Deane said that so far about $48 million of loans have been made through the pilot test, including approximately $10 million in April (2005). It sells them to Freddie on a servicing-released basis, because it cannot yet service them profitably.

In addition to lower rates — the consumer-friendly aspect — Mital said that the prime loans would help Ameriquest generate more home purchase loans, which are more plentiful than refis when rates are rising.

Noto said that in fall, 2004, Ameriquest put in place an anonymous whistle-blower policy to help the company spot employees who are not doing the right thing.

_____

Original story for *American Banker* by Erick Bergquist


[return to "what's new"](#)